UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOLLY PEREZ,<br><br>        Plaintiff,<br><br>   v.<br><br>UNITED PARCEL SERVICE,<br><br>        Defendant. | Case No.  19-cv-08050-WHO<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 50 |

Defendant United Parcel Service, Inc. ("UPS") moves for summary judgment on each of plaintiff Holly Perez's ("Perez") six causes of action, which assert in sum that UPS wrongfully terminated her in retaliation for filing a complaint about harassment on the basis of her gender. UPS terminated Perez for falsifying timecards and retaliating against employees that she supervised.  It argues that the harassment she felt arose from her role as a business manager in the context of labor/management relations.  I agree with UPS that there is no genuine dispute of material fact that UPS did not (1) discriminate against Perez on the basis of gender; (2) fail to act when it knew or should have known about harassment so severe and pervasive that it created a hostile work environment; (3) retaliate against her; (4) fail to prevent discrimination, harassment, or retaliation; (5) violate CA public policy; or (6) intentionally inflict emotional distress.  For the reasons explained below, UPS's motion for summary judgment is GRANTED for all six of Perez's causes of action.

## BACKGROUND

### I.     FACTUAL BACKGROUND

Perez started working at UPS in April 1992, as a package handler.  Dkt. Nos. 50-1, 51-3, 52-11 ("Perez Depo.") at 40.  Over the next 27 years, she was promoted to various positions,

including part-time supervisor, full-time supervisor, on-road supervisor, and finally in July 2018, business manager at the Almaden Center of the Southern Division, one of three centers located at the San Jose facility. *Id.* at 44–45.

The events at issue took place from December 2018 or January 2019 through September 2019. At this time, Perez was the only female business manager in the Southern Division. Dkt. No. 51-1 ("Perez Decl.") ¶ 7. She had three peer managers: Hector Venegas, Johnny Acafalle, and Stephen Connell. *Id.* ¶ 14. Acafalle and Venegas were the business managers at the Morgan Hill and Berryessa Centers respectively, and Connell was the pre-load manager at the pre-load operation center. *Id.* ¶ 21. From 2016 to 2018, when Perez was a full-time supervisor, she was supervised by Venegas, who was then a business manager at the Almaden Center, and who in turn was supervised by Johnny Chin, the division manager at the time. *Id.* ¶ 11. In late January 2019, Chin moved to the Oakland UPS Facility and Edward "Eddie" Valero became Perez's new division manager. *Id.* ¶ 13. Around this time, Perez oversaw five part-time supervisors: Brittney Peek, Matthew Dowling, Jennifer Pray, Noelle Christensen, and Mark Biala. *Id.* ¶ 9.

As the business manager, Perez was responsible for 100–180 employees and oversaw drivers, clerical personnel, part-time supervisors, and full-time supervisors. *Id.* ¶ 8. Most of Perez's hourly employees were represented by Teamster Local 287 Union (the "Union"); Perez was responsible for ensuring compliance with the applicable collective bargaining agreement ("CBA") and handling Union employee grievances. Perez Depo. at 67–69. The Union business agent for the Almaden Center in 2019 was John "Johnny" Gallegos and two of the Union stewards were David Padilla and Henry Huerta Mendoza. *Id.* ¶ 23. Gallegos was an employee of the Union, not UPS, whereas Padilla and Huerta were UPS employees and Perez's subordinates. *See* Dkt. Nos. 50-3, 51-11, 52-7 ("Gallegos Depo.") at 162; Perez Depo. at 74, 117.

### A.    Perez's Harassment Claims (January 2019–June 2019)

Perez asserts that Union representatives Gallegos, Padilla, and Huerta "physically and verbally harassed [her] in multiple ways" from December 2018 or January 2019 to July 2019. Perez Decl. ¶ 18. Perez repeatedly testified that those three were the only people who she believes harassed her, discriminated against her, or created a hostile work environment for her. Perez

2

Depo. at 107–08, 110, 186–87.  She admitted that they never made any comment that referenced her gender to her, let alone made any sexually explicit, sexually inappropriate, or sexist comments to her.  Perez Depo. at 145–46.  She also testified that she did not believe that Padilla and Huerta harassed her because she was a female and that their conduct that she claimed was harassment was within the scope of their duties as Union stewards.  *Id.* at 179, 186–87.  In contrast, she testified that she believed Gallegos did harass her on the basis of her gender because he treated her peer male managers differently.  *Id.* at 149–50.

### 1.    Gallegos

The alleged harassment by Gallegos began in December 2018 or January 2019, soon after Perez had first met him.  *Id.* at 120.  Gallegos  filed multiple grievances against her on the behalf of Union members, alleging that Perez harassed them in violation of the CBA.  *Id.*  Examples of these grievances included continuing to call employees to come to work after they had called in sick, telling an employee that he would be fired for insubordination if he refused to take off his Union pin as she requested, and retaliating against employees for filing grievances.  *Id.* at 159–60; Dkt. No. 50-3 at 39.  Perez testified that these were "false" grievances because her actions did not constitute harassment—UPS labor manager Chad Crouch told her that she had the right as the manager to ask these questions.  Perez Depo. at 134–35, 239.  But she did not dispute that an employee is entitled to file a grievance under the CBA and that she could not discipline or retaliate against employees for filing the grievance.  Perez Depo. at 69.  She also understood that she had to allow a Union steward or business agent to engage in Union activity.  *Id.* at 74.

Other than filing false grievances, Perez testified to three other incidents she considered to be harassment by Gallegos.  The first occurred in March 2019, when Gallegos raised a dispute about the seniority list or the employees' start schedule:  he leaned over her desk and slammed his hand on it.  *Id.* at 130–31.  In July 2019, Gallegos told Perez that he would turn her Center upside down and used profanity.  *Id.*; Perez Decl. ¶ 45.  The last incident occurred in the same month when Gallegos "got in [Perez's] face" in front of others after she asked him to let her know if he planned to speak at a meeting because he had interrupted her and told her that he had a right to speak.  Perez Depo. at 130.  When Perez asked her male peer managers whether they had been

United States District Court
Northern District of California

1  treated similarly by Gallegos, they denied it and never indicated that they were having problems

2  with Gallegos.  *Id.* at 130, 139.

3            **2.      Padilla**

4            Perez testified that she considered three conversations with Padilla to be harassment.  *Id.* at

5  184.  The first occurred when he entered Perez's office, slammed the 9.5 list on her desk, pointed a

6  finger at her, and told her that she could not ask his employees to remove themselves from the 9.5

7  list because that was a violation of the CBA.[1]  *Id.* at 180.  The second was when Padilla entered

8  Perez's office and told her not to talk to his employees and that he was receiving many complaints.

9  Perez Depo. at 182.  When asked whether Padilla raised his voice this time, Perez testified that

10  Padilla "caught himself, and . . . bit his tongue."  *Id.* at 182–83.  The last occurred when Perez sat

11  Padilla down and told him that she felt like he was harassing her and asked if he could "back off a

12  little bit" because she was a brand new manager.  *Id.* at 183.  Padilla denied harassing her and left

13  it at that.  *Id.*

14            **3.      Huerta**

15            Perez testified that Huerta's regular requests for documents and information were

16  harassment.  *Id.* at 185.  For two weeks in a row, Huerta approached Perez and handed her a piece

17  of paper saying an employee was "9.5" and asked her to fix the seniority list.  *Id.* at 184.  After the

18  third or fourth time, Perez asked him to stop because she needed time to work with HR to resolve

19  the seniority list issues and told him that she felt as though he was harassing her.  *Id.*  According to

20  Perez, Huerta appeared shocked; shortly after, she was placed on administrative leave as a result

21  of the timecard fraud investigation, which I will discuss in a moment.  *Id.* at 185.

22       **B.      UPS's Response to Perez's Harassment Claims (March 2019–September 2019)**

23            Perez testified that she complained about the harassment by Gallegos, Huerta, and Padilla

24  during the following four times:  (1) a conversation with Valero (the Division Manager) in March

25  2019; (2) emails sent to Valero and Crouch and Seymour (UPS labor managers) on March 13 and

26  
_____

27  [1] Pursuant to the CBA, employees can place themselves on a 9.5 list when they decide to work 9.5 hours or less a day.  *See* Dkt. No. 50-5 ("Padilla Depo.") at 26.  If management makes a driver on

28  the 9.5 list work over 9.5 hours a day, the Union may file a grievance on behalf of the employee and seek compensation.  *Id.* at 27.

March 15; (3) a text sent on June 19 to Jerry Sweeney, a Union manager; and (4) the UPS 1-800 Corporate Concern hotline complaint.  Perez Depo. at 196.

### 1. Communication with UPS and Union Management

The first time Perez reached out to management was in early March 2019 when she called Valero.  Perez Depo. at 153.  Perez told Valero over the phone that she felt that Gallegos was harassing her on the basis of her gender because Gallegos filed so many grievances only against her and not the other male business managers.  *Id.* at 137.

On March 13, 2019 she sent an email to UPS labor managers, Lori Seymour and Chad Crouch, copying Valero, about Gallegos, Padilla, Huerta, another Union steward Bradley Barreras, and an employee Robert Vela.  *Id.* at 152–53.  Thirty minutes later, Crouch responded and offered to sit down with Perez, Gallegos, and the other stewards, sometime after the second week of April, because he was booked until then.  *Id.* at 95; Perez Depo. at 155–56.

On March 25, 2019, Perez sent another email to Crouch and Seymour, copying Valero, about Barreras, who had filed ten grievances, including two against Perez.  *See* Dkt. No. 50-1 at 108; Perez Depo. at 159–60.  Barreras alleged that Perez harassed him because she had told him that if he wore his Union pin again he would be fired for insubordination.  *Id.*  Perez does not dispute that Barreras had the right to file the grievance and that she did not mention that she felt harassed because she was female.  Perez Depo. at 159; Dkt. No. 50-1 at 108.

On April 9, 2019, Crouch followed-up on his March 13 email and set up a meeting with Perez, Seymour, and the Union team, Gallegos, Sweeney, Barreras, and one other person Perez could not remember.  Perez Depo. at 168.  According to Perez, Crouch told the Union team to stop filing false harassment grievances against Perez.  *Id.*  She did not mention during the meeting that she felt that Gallegos was treating her differently because she was a woman.  *Id.* at 171.  Crouch also asked Gallegos and Perez if they could move forward in a positive way, to which both responded affirmatively.  *Id.* at 170.

On June 19, 2019, Perez texted Sweeney, the Union manager who supervised Gallegos. *Id.* at 188–89; *see* Dkt. No. 51-10 at 68–69.  She told him that she felt as though Gallegos was harassing her and threatened to escalate her complaints.  Dkt. No. 51-10 at 68–69.

### 2.   UPS 1-800 Corporate Concern Hotline Complaint

In the evening on July 9, 2019—the same day Perez learned that UPS was investigating her for timecard fraud—Perez called UPS's 1-800 Corporate Concern hotline and filed a complaint of harassment ("Corporate Concern Complaint"). *Id.* at 266. She talked to UPS's hotline staff and provided the hotline with a written account to give more detail on her allegations of harassment. *Id.* at 266–69. Perez did her best to provide a complete account of the harassment in her written account. *Id.* at 270; *see* Dkt. No. 50-1 at 107–15.

Marlo Austin, the district Human Resources ("HR") operations manager testified that she did not receive the automated notice until July 10, 2019 because a third-party vendor operated UPS's 1-800 Corporate Concern line. Dkt. No. 50-2 ("Austin Decl.") ¶ 39. UPS's investigation into Perez's complaint began on July 26, 2019 and lasted until August 29, 2019. Dkt. No. 50-2 ("Roberts Depo.") at 45; *see* Dkt. No. 50-1 at 106–15 ("Roberts Corporate Concern Report"). HR Manager Heather Hubbard Roberts coordinated it with the assistance of HR supervisor Kale Atencio. Roberts Depo. at 45; Dkt. No. 50-2 ("Austin Decl.") ¶ 52; Dkt. No. 50-11 at 348–52. Roberts and Atencio concluded that Perez's claims were either partially substantiated or unsubstantiated. *Id.*

Perez's first claim in her Corporate Concern Complaint was that Gallegos, Padilla, and Huerta were creating a hostile work environment for her and that they were discriminating against her on the basis of her gender because she was the only manager receiving this treatment. *Id.* at 110. Perez also claimed that she felt afraid for her and her family's well-being. *Id.* The report found that this claim was unsubstantiated: "Although there was clearly an unprofessional work environment" between Perez, Gallegos, Huerta, and Padilla, there was "no evidence that this was based on Holly's gender. The issues in the work relationship were because of Holly's unwillingness to share the information that the union requested" and consequently, the Union representatives "would file grievances to get the information needed. This would put Holly on the defensive and made the working environment uncomfortable for all employees in the center. The stewards stated Holly was retaliatory and unprofessional with them. She never reported feeling unsafe to any of the management team." *Id.* at 110–11.

With respect to the unprofessional working environment finding, Gallegos admitted to having an aggressive approach with all center managers and although Padilla denied it, Roberts and Atencio believed Padilla cursed when talking to other drivers. *Id*; Dkt. No. 50-11 at 349. Venegas, a peer manager, also agreed that Gallegos's unprofessional behavior—yelling and slamming his hands on Perez's desk—was completely unnecessary. *Id.*  Huerta admitted that he continually brought up issues with Perez but explained that Perez held grudges, refused to communicate, and ignored questions. *Id.*

Roberts and Atencio concluded that the Union had the right to file grievances against Perez, that Crouch and Valero had given Perez advice on how to handle the situation, that Perez had refused to follow the advice given, and that Perez had never told anyone that she was fearful for her or her family's safety. *Id.*  The investigation's conclusion was that the "[f]indings of gender discrimination [were] unfounded" and that "these issues were not in relation to Holly's gender but to the working environment created by the unprofessional relationship she had with the union and employees in the center." Dkt. No. 50-11 at 352.

On August 29, 2019, Roberts completed the report and on September 6, 2019, UPS contacted Perez about the investigation's outcome of her Corporate Concern Complaint. *Id.*

### C.      Timecard Fraud and Retaliation Investigations (June 2019–August 2019)

Before the investigation into Perez's Corporate Concern Complaint, UPS had been investigating allegations that Perez had instructed her part-time supervisors to fraudulently change employees' timecards and that she had retaliated against her part-time supervisors after being confronted about the fraud.  This would violate UPS's Honesty and Integrity Policy and its Anti-Retaliation Policy, both of which Perez acknowledged and signed.  *See* Dkt. No. 50-1 at 91– 92.  The Anti-Retaliation Policy prohibits, among other things, questioning employees who report concerns.  Dkt. No. 50-2 at 121–22.

#### 1.      Timecard Fraud

On June 6, 2019, an anonymous UPS employee filed a complaint against Perez with UPS's 1-800 Corporate Concern line.  Dkt. No. 50-6 at 12–17.  The employee alleged that Perez was changing employees' timecards to reduce drivers' hours, engaging in unprofessional conduct, and

retaliating against employees for filing grievances against her. *Id.* UPS Security supervisor Thomas Nichols and HR supervisor Kale Atencio were assigned as the primary security and HR investigators into the anonymous complaint. Dkt. No. 50-6 ("Nichols Decl.") ¶ 10–11. Nichols and Atencio interviewed drivers and clerks in the Almaden Center, who told them that their timecards were being fraudulently altered without their knowledge. *Id.* ¶ 12. For example, the employees reported that their clock-in, clock-out, and lunch times were being edited and their hours were being reduced. *Id.* But according to Nichols, no one provided a written statement out of fear of retaliation from Perez. *Id.*

During the investigation, on June 20, 2019, part-time supervisor Brittney Peek approached Nichols and Mickal Mengsteab, members of UPS's Security Department, with concerns about Perez's instructions to alter employees' timecards. Dkt. No. 50-8 ("Peek Depo.") at 66–68. Peek talked to them and later submitted a written statement, explaining that Perez required her to "sprinkle time" to make up for errors from the prior weeks, "change [an employee's] lunch time to make it appear that she took it between the 5th and 6th hour," "reduce the finish time on clerk time cards by just a few minutes so they don't go over 6 hours . . . so they don't have to take a lunch," "use [an employee's] sick time if he was called in but couldn't come in because [Perez] called him last minute," "change lunch times," and "add lunch times (which takes paid time away from the employee because [Perez] does not instruct me to add the same amount of time to the finish time . . . )." Dkt. No. 50-6 at 22–23. Peek also provided UPS's Security team with text messages that she exchanged with Perez about the timecard edits, a meal compliance violation report with a handwritten note from Perez directing her to edit a clerk's timecard, and a photograph of notebook entries that Peek said were directives from Perez to alter employee timecards on particular days. Dkt. No. 50-6 at 18–21.

On July 3, 2019, Brian Woods, UPS's security director, and Marlo Austin, the district HR operations manager, met with Perez about the alleged timecard fraud. Perez Depo. at 215. When Woods and Austin showed her the handwritten note and a text message between her and Peek about editing an employee's timecard, Perez admitted to instructing Peek and Dowling to make changes. *Id.*; Perez Depo. at 221. She said that she had been instructed by her division manager,

Chin, to make edits to timecards. *Id.* at 223. For example, she was instructed to change the times from AM to PM if the driver put in the wrong time. *Id.* Woods and Austin did not show her the timecard reports during the meeting. *Id.* Austin asked her who had trained Peek and Dowling; Perez responded that she had not trained them because she had never received training about timecards (e.g., how to fix them or do them). *Id.* at 238–39. In her 27-year career, Perez had never edited time logs and did not know how. Perez Depo. at 22; Perez Decl. ¶ 50. Austin then told Perez that if she ever conducted any training with her employees that she needed to document it. Perez Depo. at 239.

On July 8, 2019, Woods drafted a memorandum to Austin and Herbert "Herb" Garrett, the HR director, summarizing the investigation and recommending that Perez be terminated for timecard fraud. Dkt. No. 50-9 at 16–17 ("Woods Email, July 8, 2019"). Woods wrote that Perez had admitted that she instructed the employees to falsify timecards by editing them in order to prevent violations from showing on the reports. *Id.* Perez explained that she believed that if the timecards were "left unchanged, the meal and breaks would reflect as an error on the daily report" and that "the timecard would [not] run unless the changes were made." *Id.* Woods wrote that he believed Perez was dishonest and intentionally evasive during the interview because she initially denied instructing her employees to make changes to the timecards and frequently stated, "I don't recall" in response to questions. *Id.* According to Woods, Perez also denied knowing what a timecard edit log is and what the intent and purpose for using a timecard edit log was. *Id.* He wrote that he did not believe Perez's explanation that she did not understand the basic timecard procedures and that she did not know her conduct was improper. *Id.*

## 2.    Perez's Retaliation against Peek and Dowling

On July 1, 2019, two days before the meeting with Woods and Austin, Perez learned from Pray that Peek had shared information with Gallegos, Padilla, and Huerta about who had been taking half-hour lunches and who had violated 9.5s. Perez Depo. at 238. That day, Perez spoke with Peek and told her that she was not supposed to do this. *Id.*; Peek Depo. at 122. Perez also called Crouch on July 1 to see if part-time supervisors were allowed to give such information to stewards; Crouch said that they were not and that it was against UPS policy. Perez Depo. at 239.

On July 2, 2019, Gallegos asked Peek for a report that listed the drivers who took all of their breaks and took their lunch on time. Dkt. No. 50-10 at 11. Peek only gave Gallegos the names of the drivers and, according to Peek, informed Perez of Gallegos's request. *Id.* That same day, Christensen, another part-time supervisor, told Perez that Peek and Dowling were still giving out UPS information to the Union. Perez Depo. at 238.

After being told by Austin to document any future trainings with her employees, Perez decided to talk to Peek and Dowling and record the counseling in writing. *Id.* at 239. After Perez met with Austin and Woods on July 3, 2019, she confronted Peek and Dowling about sharing information and documents with the Union. *Id.* at 237. She spoke with Peek and Dowling in her office with Venegas present and instructed them to not share any information with the Union. *Id.* at 251. Peek explained to Perez that Danette "Dee" Brown, a full-time supervisor, had given her the order to give the Union the information. Peek Depo. at 122. Perez made Peek and Dowling sign statements that they would bring all documentation requests to Perez or a full-time supervisor and would not share the information with a Union business agent, Union steward, or an hourly employee. *Id.* at 251; *see* Dkt. No. 50-10 at 17, 21. Perez placed their statements in their personnel files and documented that they had been counseled in their permanent HR records. Perez Depo. at 251, 257; Dkt. No. 50-10 at 18, 22. Peek also testified that Perez refused to give her a copy of her signed statement. Peek Depo. at 122. Two days later, Perez also gave the same instructions to her other part-time supervisors, Pray and Christensen, received signed written statements, and documented that Pray and Christensen had been counseled in their permanent HR records. *See* Dkt. No. 50-10 at 19–20, 23–24.

When asked why she felt the need to speak to the part-time supervisors, Perez responded that she figured this was a training opportunity for them because this was a UPS policy that she did not know herself. Perez Depo. at 244. When asked why Venegas was present, Perez testified that she did not want anyone to feel as though she were reprimanding or disciplining Peek and Dowling and that Venegas knew the Union bylaws better than she did so he could answer any potential questions. *Id.* at 245.

Immediately after Perez confronted Peek and Dowling, Peek texted Nichols, exclaiming

United States District Court
Northern District of California

that she was afraid that she was going to lose her job.  Peek Depo. at 85–86.  Two days later, on July 5, 2019, Peek sent an email to Mengsteab and Nichols that explained in more detail why she felt that Perez was retaliating against her.  Dkt. No. 50-10 at 11–12.  Mengsteab forwarded Peek's complaint to Garrett.  Dkt. No. 50-10 at 11.

On July 9, 2019, the day after Austin received Woods's recommendation to terminate Perez for timecard fraud, Austin was instructed to place Perez on paid administrative leave while Peek's retaliation complaint was investigated.  Austin Decl. ¶ 38.  According to Austin, Perez called in sick on July 10, so she placed Perez on administrative leave on July 11, 2019.  *Id.*  That same day, Austin told Perez that she would be on administrative leave while Peek's retaliation complaint was investigated.  *Id.*  Austin also asked Perez about her July 3 meeting with Peek and Dowling to determine whether Perez had retaliated against Peek and Dowling for the timecard fraud allegations.  *Id.*  Perez said that she had not known that Peek and Dowling had complained until Austin mentioned it during the meeting.  *Id.*

While Perez was on administrative leave, UPS's HR and Security teams investigated Peek's complaint and concluded that Perez had retaliated against Dowling and Peek.  Dkt. No. 50-10 ("Mengsteab Decl.") ¶¶ 32–34; Austin Decl. ¶ 43.  The report found, "The day after Perez was interviewed about the time card [sic] package scan manipulation she reprimanded Peek and Dowling" who "were brought into the office in an interrogation style format and forced to complete a write up statement of understanding."  Dkt. No. 50-2 at 133 ("Roberts Retaliation Report").  Both Dowling and Peek were refused a copy of what they had signed and there was no investigation into the alleged sharing of information with the Union.  *Id.* at 134.  Although full-time supervisor Brown had asked Peek to provide information to the Union, Brown was not reprimanded, and Pray and Christensen were treated differently than Peek and Dowling—they were allowed to type out their acknowledgement, keep a copy, and turn it in at their leisure "[w]ith no pressure."  *Id.* at 134.

As a result of the investigation, on August 7, 2019, Valero and Austin met with Perez and informed her that she was terminated.  Austin Decl. ¶ 46.  At the meeting, Austin provided Perez with information on UPS's Employment Dispute Resolution ("EDR") process by which Perez

could appeal her termination; Perez declined because she had heard negative things about that process. *Id.* at 276–77.

Perez testified that she was fired "for the falsification of documents and timecards" and for "retaliation," the latter of which she did not realize was a reason for termination until the mediation in this case. Perez Depo. at 274, 280. She stated that she does not have any evidence to suggest that her termination had anything to do with being female. *Id.* at 306. But she added that she knows of six managers who committed timecard violations and were demoted but were eventually promoted back to their original positions, not terminated. *Id.* at 282–83, 302–03. According to Perez, these individuals were Sidney Green, Jed Wells, Jay Wisnicki, Ryan Pedego, and John Lepelt. *Id.* at 305. Perez does not know anyone who had retaliated against employees or anyone who had committed timecard fraud and retaliated but was not terminated. *Id.* at 306. Perez also testified that she believed that Gallegos was involved in the decision to terminate her employment because he would go behind her back and talk to her full-time supervisors to see how they were being treated and to see if she was doing anything wrong. *Id.* at 274. But she admitted that she has no evidence that Gallegos, Huerta, or Padilla were involved in the decision to terminate her employment or her retaliation against Peek and Dowling. *Id.* at 275.

## II.   PROCEDURAL HISTORY

On December 6, 2019, Perez filed this action against UPS, alleging six causes of action, the majority of which are under California's Fair Employment and Housing Act ("FEHA"): (1) UPS discriminated against her because of her gender in violation of CAL. GOV'T CODE § 12940(a); (2) Perez experienced severe or pervasive harassment because of her gender and was therefore subject to a hostile work environment in violation of CAL. GOV'T CODE § 12940(j); (3) UPS retaliated against her by terminating her employment for a protected activity in violation of CAL. GOV'T CODE § 12940(h); (4) UPS failed to prevent discrimination, harassment, and retaliation in violation of CAL. GOV'T CODE § 12940(k); (5) UPS's termination of Perez was a violation of a fundamental public policy of California; and (6) UPS inflicted intentional emotional distress. Dkt. No. 1 ("Complaint"). Fact discovery ended on April 1, 2021. Dkt. No. 39. On May 3, 2021, UPS filed this present motion for summary judgment. Dkt. No. 50 ("Mot.").

1

## LEGAL STANDARD

A party is entitled to summary judgment where it "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if it could reasonably be resolved in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material where it could affect the outcome of the case. *Id.*

The moving party has the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Once the movant has made this showing, the burden shifts to the nonmoving party to identify specific evidence showing that a material factual issue remains for trial. *Id.* The nonmoving party may not rest on mere allegations or denials from its pleadings but must "cit[e] to particular parts of materials in the record" demonstrating the presence of a material factual dispute. FED. R. CIV. P. 56(c)(1)(A); *see also Liberty Lobby*, 477 U.S. at 248. The nonmoving party need not show that the issue will be conclusively resolved in its favor. *Id.* at 248–49. All that is required is the identification of sufficient evidence to create a genuine dispute of material fact, thereby "requir[ing] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* (internal quotation marks omitted). If the nonmoving party cannot produce such evidence, the movant "is entitled to . . . judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323.

On summary judgment, the court draws all reasonable factual inferences in favor of the nonmoving party. *Liberty Lobby*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise a genuine factual dispute and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738–39 (9th Cir. 1979).

**DISCUSSION**

## I. EVIDENTIARY OBJECTIONS

As a preliminary matter, I will address the parties' evidentiary objections.  For the reasons explained below, Perez's motions to strike the entirety of Mengsteab's declaration, portions of Woods's, Austin's, Nichols's, and Mengsteab's declarations, and all of UPS's accompanying exhibits to its reply are DENIED.  UPS's motion to strike ¶ 15 of Perez's declaration is GRANTED.  In addition, the references in Perez's declaration to Vela as another alleged harasser in ¶¶ 22, 24, 26, 28, and 47, and any statement in ¶¶ 33, 35, 36, 39, 41, and 43 that exaggerates the specific conduct of Gallegos, Padilla, and Huerta and the frequency of "harassing" incidents from what Perez testified during her deposition is inadmissible.

### A. Mengsteab Declaration

Perez moves to strike the declaration of Mengsteab (Dkt. No. 50-10), a manager in UPS's security department, because UPS had not disclosed Mengsteab as a witness.  Dkt. No. 51 ("Opp.") at 29.  But the Advisory Committee Notes for FED. R. CIV. P. 26(e) explain that there is "no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process, as when a witness not previously disclosed is identified during the taking of a deposition or when an expert during a deposition corrects information contained in an earlier report."  UPS's disclosure of Mengsteab's identity during document production and during Woods's deposition is sufficient.  *See* Reply at 16–17; Dkt. No. 50-7 ("Woods Depo.") at 78.

The single case that Perez relies on to argue that UPS's disclosure of Mengsteab's identity in a deposition is not dispositive is distinguishable.  *See* Opp. at 29.  In *Bal Seal Eng'g, Inc v. Nelson Prod., Inc*, 2019 WL 7865198, at *3 (C.D. Cal. Oct. 17, 2019), the district court found that defendant's disclosure and subpoena of 11 companies in multiple pre-trial documents was not sufficient to put plaintiff on notice because defendant had disclosed as many as 191 companies in various filings and discovery requests.  The *Bal Seal Eng'g, Inc* court also cited a Ninth Circuit case that held that "the mere mention of a name in a deposition is insufficient to give notice to Plaintiffs that [defendant] intend[ed] to present that person at trial."  *Id.* (citing *Ollier v.*

14

1    *Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 863 (9th Cir. 2014) (internal quotation marks

2    omitted)).  Here, UPS disclosed Mengsteab's identity in Woods's deposition and in multiple

3    documents.  Further, in contrast to the 191 companies disclosed in *Bal Seal Eng'g*, Mengsteab is

4    only one out of the eleven witnesses that UPS disclosed.  Perez's motion to strike Mengsteab's

5    declaration is DENIED.

6              **B.       Declarations of Woods, Austin, Nichols, and Mengsteab**

7         Next, Perez moves to strike portions of the declarations of Woods, Austin, Nichols, and

8    Mengsteab because they allegedly lacked personal knowledge of the contested statements.  Opp. at

9    29.  All of the statements at issue concern the timecard fraud investigation.  Dkt. No. 50-9

10   ("Woods Decl.") ¶¶ 40–42, 59, 66; Dkt. No. 50-6 ("Nichols Decl.") ¶¶ 22–24, 29–30; Mengsteab

11   Decl. ¶¶ 14–18; Dkt. No. 50-2 ("Austin Decl.") ¶ 28.  Perez argues that the declarants lack

12   personal knowledge because they "did not witness any 'fraud' by Perez, did not explain how the

13   Timecard Audit Reports prove drivers were shortened any time, did not provide any supporting

14   documentation as 'evidence', did not ground their statements in 'observations and experience'"

15   and "it cannot be reasonably inferred from the declarations the nature of their participation in the

16   matters to which they swore."  Opp. at 29 (internal citations omitted).  But contrary to Perez's

17   assertions, nearly all of the statements describe the declarants' own personal conduct.  The one

18   exception is Austin's statement, but Austin was personally aware of the conclusion to the

19   investigation because the results were shared with her.  *See* Dkt. No. 50-2 at 132.  Accordingly,

20   Perez's motion to strike portions of these declarations is DENIED.

21             **C.       Perez's Declaration**

22        UPS moves to strike various portions of Perez's declaration.  First, UPS contends that ¶ 15

23   of Perez's declaration should be struck because it concerns the alleged sexual harassment by a

24   driver, George Torres, whose conduct Perez admits is not at issue in this case.  Reply at 17; *see*

25   Perez Depo. at 141.  Because it is irrelevant and inadmissible under Federal Rule of Evidence 402,

26   UPS's motion to strike ¶ 15 is GRANTED.

27        UPS next moves to strike portions of Perez's 27-page declaration filed in opposition to the

28   motion for summary judgment because they contradict her deposition taken on October 29, 2020.

United States District Court
Northern District of California

Reply at 17–18.  The general rule in the Ninth Circuit is that "a party cannot create an issue of fact by an affidavit contradicting [her] prior deposition testimony," but in order to dispose a case "the district court must make a factual determination that the contradiction was actually a 'sham.'" *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266–67 (1991).  In other words, the court must find that the conflicting affidavit "flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment." *Id.* at 267.  The "inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012).

UPS contends that ¶¶ 22, 24, 26, 28, and 47 should be struck because in these paragraphs Perez asserts that Robert Vela had also harassed her even though she testified at least four times in her deposition that she was only claiming that Gallegos, Padilla, and Huerta had harassed her. Reply at 17–18; *see* Perez Depo. at 107–08, 110, 186–67.  Vela is not identified as a harasser in the Complaint or in her deposition.  It is too late to recover a memory of a harasser after discovery closes.  His addition contradicts Perez's prior testimony; the inconsistency is clear and unambiguous.  I will strike the references to Vela as a harasser in ¶¶ 22, 24, 26, 28, and 47.

UPS also argues that ¶¶ 17, 33, 35, 36, 39, 41, and 43 should be struck because these paragraphs contradict Perez's deposition testimony about when the harassment began, the specific conduct that constituted harassment, and the frequency of the harassment.  Reply at 17–18.  I overrule the objection in ¶ 17, where Perez asserts that the harassment by Gallegos began in December 2018 even though she testified in her deposition that she first started having issues with Gallegos in January 2019.  *See* Perez Depo. at 120.  It is not unusual for a witness to be confused about dates.

But Perez unambiguously contradicts her deposition testimony when she describes the specific conduct that constituted harassment in ¶¶ 33, 35, 36, 39, 41, and 43 of her declaration. During her deposition, Perez testified that other than two instances and filing false grievances against her, she could not think of anything else at the time that she would consider harassment by Gallegos.  Perez Depo. at 131–32.  Perez also testified that other than three incidents there was nothing else that Perez considered to be harassment by Padilla.  *Id.* at 184.  And other than asking

United States District Court
Northern District of California

1    for documents on a regular basis there was nothing else that Huerta did to Perez that she

2    considered to be harassment.  *Id.* at 185.  Yet in her declaration she recounts that Padilla and

3    Huerta yelled at her "on a daily basis," that their "harassment was continuing to be very intense on

4    a daily basis," that Padilla "continued to behave in a totally demeaning, rude, and physically

5    threatening manner to [her] on a daily basis," that Padilla was "constantly harassing" her, that the

6    "hostile work environment created by David Padilla . . . was escalating in severity every day," and

7    that "Gallegos and Padilla did not stop harassing [her]."  Perez Decl. ¶¶ 33, 35, 36, 39, 41, 43.

8    These statements in ¶¶ 33, 35, 36, 39, 41, and 43 of Perez's declaration are inadmissible because

9    they are so inconsistent with her earlier testimony that they constitute a sham.

10        **D.    UPS's Reply Exhibits**

11            Perez moves to strike all of the exhibits accompanying UPS's reply.  First, UPS's exhibits

12    4–6 are the declaration of UPS's former counsel, Alison Pulaski Carter, and its accompanying

13    exhibits A–D (collectively, the "Carter Declaration").  Dkt. No. 53.  Perez asserts that ¶¶ 5–7 and

14    Exhibits B and C of the Carter Declaration should be struck because (1) Carter lacks foundation

15    and personal knowledge to submit Exhibit B, which are "copies of the timecard audit reports used

16    by investigators in reviewing alterations to employees' timecards in response to the complaint"

17    against Perez; (2) Exhibit B should be offered as expert testimony; (3) Exhibit B is "inadmissible,

18    unauthenticated hearsay, with no exception for its presentation"; and (4) Carter lacks foundation

19    and personal knowledge to authenticate Exhibit D,[2] which are "copies of grievances filed against"

20    certain individuals, which also "contain multiple levels of hearsay."  Dkt. No. 53 at 2–3.

21            At summary judgment, hearsay, lack of foundation, and relevance objections "are not

22    well-taken.  Rule 56 requires only that evidence *would be* admissible at trial, not that it 'presently'

23    is admissible."  *Uschold v. Carriage Servs., Inc.*, No. 17-CV-04424-JSW, 2020 WL 1466172, at

24    *3 (N.D. Cal. Mar. 6, 2020), appeal dismissed, No. 20-15523, 2020 WL 3470090 (9th Cir. Apr.

25    24, 2020) (emphasis in original); *see* FED. R. CIV. P. 56(c)(4).  Perez does not dispute that, "[a]t

26    the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We

27

28    _____
     [2] Perez mistakenly identifies Exhibit C as the "copies of the grievances" instead of Exhibit D.

United States District Court
Northern District of California

1    instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th

2    Cir. 2003); *see* Dkt. No. 53 at 2 ("Court's focus at summary judgment must not be on the form of

3    the evidence submitted but on whether its content would be admissible.").  But she has not shown

4    that UPS will be unable to introduce the information that she has identified as hearsay or lacking

5    foundation in an acceptable format at trial.  *See Uschold*, 2020 WL 1466172, at *3.

6            On the other hand, "Rule 56 explicitly requires that summary judgment affidavits 'be made

7    on personal knowledge,'" *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657

8    F.3d 936, 950 n. 9 (9th Cir. 2011).  In this case, Carter, as UPS's former counsel, does have

9    personal knowledge that these were the copies of the timecard audit reports and grievances that

10   UPS produced in response to Perez's production requests.  Accordingly, Perez's motion to strike

11   the Carter Declaration is DENIED.

12           Perez also moves to strike Exhibits 1–3 and 7–15, all of which are deposition excerpts,

13   because of the following procedural errors:  "(1) the cited portions constitute impermissible new

14   evidence on reply; (2) these exhibits were simply tacked on to the brief, without proper

15   authentication; (3) the cited portions are not properly highlighted or otherwise designated in the

16   attachments; and (4) not all of the cited portions of the exhibits is actually relevant."  Dkt. No. 53

17   at 3.  Perez also argues that portions of the depositions contain inadmissible hearsay.  *Id.*

18           In particular, Perez asserts that Exhibits 2, 8, and 13—the deposition excerpts of Chin,

19   Garrett, and Valero—should be struck because UPS had not attached these to its initial motion and

20   therefore these exhibits are impermissible new evidence.  *Id.* at 3–4.  The Ninth Circuit has held

21   that "[w]here new evidence is presented in a reply to a motion for summary judgment, the district

22   court should not consider the new evidence without giving the [non-]movant an opportunity to

23   respond." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).  But here, Exhibits 2, 8, and 13

24   are not new evidence.  In fact, Perez relies on these same depositions in her opposition.  *See* Dkt.

25   Nos. 51-5, 51-7, 51-9.  Moreover, UPS does not rely on these exhibits to assert new arguments in

26   its reply but to counter Perez's opposition, which used portions of the same depositions.  *See*

27   Reply at 8, 12, 15.  Perez's motion to strike these three exhibits is DENIED.

28           As for Perez's argument that none of UPS's exhibits have an accompanying declaration, it

18

is true that Civil Local Rule 7-5(a) requires "Extracts from depositions . . . and other evidentiary matters must be appropriately authenticated by an affidavit or declaration."  But courts in this district have held that it "is generally not appropriate at summary judgment to award a decision based on technicalities alone . . . Summary judgment is not a game of 'Gotcha!' in which missteps by the non-movant's counsel, rather the merits of the case, can dictate the outcome."  *Uschold*, 2020 WL 1466172, at *4 (internal quotation marks and citation omitted).  All of UPS's deposition exhibits are proper because they include a court reporter's certification and identify the deponent's name and the action.  *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002) (observing that, at summary judgment, a deposition excerpt is authenticated when it includes the deponent's name, the action, and a court reporter's certification).  Moreover, Perez does not argue that these depositions excerpts are not what they purport to be, likely because Perez relies on all of the same depositions in her opposition.  *See* Dkt. Nos. 51-3, 51-4, 51-6, 51-8, 51-11, 51-13, 51-12, 51-9, 51-10, 51-14.

Accordingly, the procedural defects—that the deposition excerpts were submitted without an accompanying declaration and were not highlighted—are not sufficient to strike these depositions.  Perez's arguments about relevance and hearsay are not well-taken and she has not shown that UPS will be unable to introduce the deposition excerpts in an acceptable format at trial. Perez's motion to strike the rest of UPS's exhibits is DENIED.

## II.  WHETHER PEREZ WAS SUBJECTED TO HARASSMENT AND/OR DISCRIMINATION BASED ON HER GENDER

Under her first and second causes of action, Perez claims that (1) UPS discriminated against her because of her gender in violation of CAL. GOV'T CODE § 12940(a); and (2) Perez experienced severe or pervasive harassment because of her gender and was therefore subject to a hostile work environment in violation of CAL. GOV'T CODE § 12940(j).  Compl. ¶¶ 33–42, 43–50. For the reasons explained below, both claims fail.

### A.  Gender Discrimination Claim

Perez's first cause of action against UPS in violation of CAL. GOV'T CODE § 12940(a), alleges that UPS discriminated against her on the basis of gender and that her gender was a

substantial motivating reason for UPS's decision to subject her to adverse employment actions, including termination. Compl. ¶¶ 33–42. Perez admits that she does not have any direct evidence to suggest that her termination had anything to do with being female. Perez Depo. at 306. But she may establish a prima facie case of gender discrimination by circumstantial evidence if she proves that (1) she was a member of a protected class; (2) she was performing her job in a satisfactory manner; (3) she suffered an adverse employment decision; and (4) she was treated differently than similarly situated persons outside her protected class or other circumstances give rise to an inference of discrimination. *See Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010). If she can establish a prima facie case, the "burden of production, but not persuasion, then shifts to [UPS] to articulate some legitimate, nondiscriminatory reason for the challenged action." *Id.* at 1155. If UPS meets this burden, she "must then raise a triable issue of material fact as to whether [UPS's] proffered reasons for their terminations are mere pretext for unlawful discrimination." *Id.*

### 1.     Prima Facie Case of Gender Discrimination

#### a.     Timecard Fraud

Although the parties do not dispute that Perez is a member of a protected class or that she suffered adverse employment decisions—being placed on administrative leave and termination—they dispute whether she was performing her job in a satisfactory manner. Perez asserts that there is a prima facie case of gender discrimination because "Perez was ignored; unfairly disciplined more harshly than male co-workers; placed on administrative leave; subjected to a botched investigation; her complaints of harassment were not investigated until after her termination (and then cursorily, with a fraudulent report); and as the icing on the cake, she was terminated." Opp. at 22–23.

UPS's defense is based in part on its timecard fraud investigation in June 2019, in which it concluded that Perez had directed her part-time supervisors to fraudulently change employees' timecards. Mot. at 27. During the investigation, Perez admitted that she "directed the PTPCs to falsify the timecards" and that "moving forward she wouldn't do this again." Dkt. No. 50-9 at 17. While in her opposition Perez argues that "the 'fraud' with timecards never happened," Opp. at 23,

1    in her deposition testimony she admitted to violating UPS's Honesty and Integrity Policy because

2    she had "corrected timecards when [she] shouldn't."  Perez Depo. at 63.  Perez's defense during

3    the deposition was not that she had never falsely changed timecards but that she had never been

4    trained on how to properly edit timecards.  *Id.* at 238–39.

5         In her opposition, Perez also asserts that UPS has no independent evidence that she had

6    falsified timecards because Woods's and Nichols's declarations about the timecard fraud

7    investigation contain hearsay and that there was no evidence of the edited time reports.  *Id.*  In

8    response, UPS submitted copies of edited time reports by Dowling and Peek.  *See* Dkt. Nos. 52-4.

9    Further, Peek, a part-time supervisor, testified and provided evidence that Perez had instructed her

10   to falsely alter the timecards.  Dkt. No. 50-6 at 18–23.  Accordingly, there is sufficient evidence to

11   show that Perez had committed timecard fraud.

12        Perez argues that editing timecards was a common practice.  During the July 3, 2019,

13   meeting with Austin and Woods, when asked whether she instructed Peek and Dowling to make

14   changes to the timecards, e.g., "to make changes to the AM and the PM times," she responded that

15   she had done so because Chin told her to.  Perez Depo. at 223.  However, Chin described a

16   procedure that is starkly different from what Perez did.  Chin testified that he directed his part-

17   time supervisors to edit timecards only when there were "regular mistakes," for example when

18   "people thought they came back at 12:10 and they really came back at . . . 12:05."  Dkt. No. 51-5

19   ("Chin Depo.") at 28.  He also testified that one was supposed to notify the employee every time a

20   supervisor edited the timecard.  *Id.*  Similarly, Venegas testified that if something is incorrect in a

21   timecard, for example, an A.M. time that should be a P.M. time, he would make a correction and

22   review it with the driver.  Dkt. Nos. 50-12, 52-14 ("Venegas Depo.") at 38–39.

23        In comparison, Peek told the UPS investigators that Perez had instructed her to "sprinkle

24   time" to make up for errors from the prior weeks, "change [an employee's] lunch time to make it

25   appear that she took it between the 5th and 6th hour," "reduce the finish time on clerk time cards by

26   just a few minutes so they don't go over 6 hours . . . so they don't have to take a lunch," "use [an

27   employee's] sick time if he was called in but couldn't come in because [Perez] called him last

28   minute," "change lunch times," and "add lunch times (which takes paid time away from the

United States District Court
Northern District of California

21

1   employee because [Perez] does not instruct [Peek] to add the same amount of time to the finish

2   time . . . )." Dkt. No. 50-6 at 22–23.  Unlike Chin's and Venegas's process for editing timecards,

3   there is no evidence that Perez notified the employees of the edits made.[3]  Perez says that she "did

4   not know" she was "supposed to print out the timecard, get with the shop steward, and sit down

5   and do discipline."  Perez Depo. at 209.  In addition, UPS's Security team interviewed drivers and

6   clerks in the Almaden Center who affirmed that their timecards were being fraudulently altered

7   without their knowledge.  Nichols Decl. ¶ 12.

8        Taking all reasonable inferences from the evidence in Perez's favor, I conclude that she

9   cannot establish a prima facie case of gender discrimination because she failed to perform her job

10   in a satisfactory and competent manner, as evidenced by her admission to falsifying her

11   employees' timecards.

12                    **b.**        **Retaliation**

13        UPS also contends that Perez was not performing her job satisfactorily because she

14   violated its Anti-Retaliation Policy.  Reply at 12–13.  Later on the same day that Woods and

15   Austin confronted Perez about directing Peek and Dowling to fraudulently edit timecards, Perez

16   brought Peek and Dowling to her office with Venegas as a witness, told them they were not

17   allowed to hand over any information to the Union without her or a full-time supervisor's

18   permission, made them sign individual statements agreeing to this, refused to give them a copy of

19   their statements, put their signed statements in their personnel files, and recorded that she had

20   counseled them in their permanent HR records.  Perez Depo. at 237, 251, 257; Dkt. No. 50-10 at

21   18, 22; Peek Depo. at 122.  Immediately after that meeting, Peek texted Nichols exclaiming that

22   she was afraid that she was going to lose her job; two days later, Peek sent an email to Mengsteab

23   and Nichols accusing Perez of retaliation.  Peek Depo. at 85–86; Dkt. No. 50-10 at 11–12.  Two

24

25   [3] Perez also asserts that "Venegas and Chin did not believe that Perez falsified time cards [sic]"
    and therefore she did not falsify timecards.  Opp. at 24.  But this is a mischaracterization of their

26   testimonies.  Chin testified that he did not "have any knowledge that Holly Perez ever did
    anything improper with timecards" and that he did not "have any personal knowledge that Holly

27   Perez instructed anybody to do anything inappropriate with timecards."  Chin Depo. at 30, 36.
    Perez's citation to Venegas's deposition does not mention Perez at all.  *See* Venegas Depo. at

28   38–40.  In addition, neither Venegas nor Chin were part of UPS's investigation into the timecard
    fraud allegations; Perez does not suggest that they saw the evidence and concluded otherwise.

United States District Court
Northern District of California

22

1    days after that, Perez also met with her other part-time supervisors, Pray and Christensen, about

2    giving the Union information without permission, received signed written statements, and

3    documented the conversation in their permanent HR records.  *See* Dkt. No. 50-10 at 19–20, 23–24.

4         After an investigation in July–August 2019, UPS concluded that Perez had retaliated

5    against her two part-time supervisors.  *See* Roberts Retaliation Report.  On July 3, 2019, Perez

6    confronted Peek and Dowling but never reprimanded Brown even though Peek had told Perez that

7    Brown had told her to give the Union the information.  Peek Depo. at 122; Roberts Retaliation

8    Report at 134.  UPS also found that Perez had treated Pray and Christensen differently than Peek

9    and Dowling—they were not interrogated in Perez's office with another business manager and

10   were allowed to type out their acknowledgement, keep a copy, and turn it in at their leisure "[w]ith

11   no pressure."  Roberts Retaliation Report at 134.

12        Perez argues that she did not retaliate against Peek and Dowling.  She testified that two

13   days before the meeting with Woods and Austin, she had told Peek that she was not supposed to

14   share information with the Union.  Perez Depo. at 238.  The next day, Perez learned that Peek and

15   Dowling were still giving out UPS information to the Union.  *Id.* at 238.  After being told by

16   Austin to document any future trainings, Perez decided to talk to Peek and Dowling on July 3,

17   2019, and to document the conversation.  *Id.* at 239.  She asserts that she did not know who had

18   accused her of timecard fraud until the July 11, 2019 meeting with Austin.  Austin Decl. ¶ 38.

19        Taking all reasonable inferences from the evidence in Perez's favor, there is a genuine

20   dispute about whether Perez retaliated against Peek and Dowling.  But because I find that Perez

21   had not performed her job satisfactorily due to the timecard fraud, this dispute is immaterial.

22                         **c.     Disparate Treatment**

23        There is also a question of whether UPS treated Perez differently than others outside of her

24   protected class, but again, I find this dispute to be immaterial.  UPS asserts that Perez cannot

25   establish that she was treated differently than male employees because she testified that she does

26   not know anyone who had not been terminated despite committing timecard fraud and retaliating

27   against subordinates.  *Id.* at 306.  But Perez contends that she was treated differently because she

28   knew of male employees who "were investigated for similar conduct (scanning and timecards)"

United States District Court
Northern District of California

but were not terminated.  Opp. at 24.  If Perez  proved that she did not retaliate against Peek and Dowling, then she would have evidence that she was treated differently than male managers when she was terminated for timecard fraud.  But this dispute is immaterial because UPS's reasons for terminating Perez are legitimate as explained below.

### 2.     Legitimate, Nondiscriminatory, and Non-pretextual Reason

If Perez could establish a prima facie case of gender discrimination, she cannot show that UPS's reason for termination—timecard fraud and retaliation—was a pretext for gender discrimination.  Perez asserts that "[t]he evidence is clear that Perez was terminated in retaliation for her harassment and gender" because (1) UPS's employees cannot agree on the reason for Perez's termination and so there can be no legitimate business reason for termination; (2) it is unclear who had the authority to terminate Perez; (3) Austin was aware of Perez's July 9, 2019 Corporate Concern Complaint of discrimination when she terminated Perez; and (4) UPS failed to thoroughly investigate her Corporate Concern Complaint.  Opp. at 22, 26.

UPS responds that the decision-maker was Austin, who testified that Perez had been terminated for timecard fraud and retaliation.  Reply at 13–15; Austin Decl. ¶ 37–38, 39.  Austin had the authority to terminate Perez after she received approval from UPS's counsel and HR.  *Id.*

Although Perez argues that she was only told that she was terminated for timecard fraud and that she did not know she had also been terminated for retaliation until this case began, Perez Depo. at 274, 280, her testimony is consistent with UPS's explanation.  Perez testified that on August 7, 2019, she met with Valero and Austin at UPS's district office in Oakland to discuss her termination.  Perez Depo. at 273.  When Perez asked who made the decision to terminate her, Austin said, "UPS lawyers."  *Id.* at 274.  When Perez asked for the reason for termination, Austin responded, "[f]alsification of documents and timecards."  *Id.* at 274.  Valero also stated, "with the conclusion of the investigation, we're terminating you."  *Id.* at 273.  By "investigation," Valero referred to the retaliation investigation because the timecard fraud investigation concluded around July 8, 2019 and Austin told Perez on July 11, 2019, that she had been placed on administrative leave, pending the results of the retaliation investigation.  *See* Perez Decl. ¶ 82; Dkt. No. 50-9 at 16–17.  There is no genuine dispute that Austin terminated Perez because of timecard fraud and

United States District Court
Northern District of California

1  retaliation.

2    Both the timecard fraud and retaliation investigations began before Perez submitted her

3  Corporate Concern Complaint on July 9, 2019.  Perez Depo. at 266–69.  Although Austin knew of

4  Perez's Corporate Concern Complaint when she terminated Perez in August, the timecard fraud

5  investigation began on June 6, 2019, after UPS had received an anonymous tip, and the retaliation

6  investigation began after Peek submitted her complaint on July 5, 2019.  Dkt No. 50-6 at 12–17;

7  Dkt. No. 50-10 at 11–12.  In fact, the UPS security director, Woods, recommended that Perez be

8  terminated on July 8, 2019, one day before Perez called the Corporate Concern hotline.  Dkt. No.

9  50-9 at 16–17.  Austin also explained that the decision to put Perez on administrative leave

10  occurred on July 9, 2019, before Perez filed her Corporate Concern Complaint that evening, and

11  that it was only because Perez called in sick the following day that Austin met with her on July 11,

12  2019 and placed her on administrative leave.  Austin Decl. ¶ 38.  Austin declared that she was not

13  aware of Perez's Corporate Concern Complaint until July 10, a day after she was told to put Perez

14  on administrative leave, because the hotline is overseen by a third-party vendor.  *Id.* ¶ 39.

15    Finally, even if Perez's allegations that Roberts' investigation into Perez's Corporate

16  Concern Complaint was flawed were true,[4]  this is irrelevant to establishing that Perez's

17  termination was pretextual.  Reply at 15.  Perez admitted that she has no evidence that Gallegos,

18  Huerta, or Padilla—the only people Perez alleged had harassed her—were involved in the decision

19  to terminate her employment.  *Id.* at 275.  The timecard and retaliation investigations began before

20  UPS was aware of Perez's Corporate Concern Complaint and Roberts' investigation report finding

21  that Perez's Corporate Concern Complaint was mostly unsubstantiated was finalized on August

22  29, 2019, several weeks after Perez's termination.  Dkt. No. 50-11 at 348–52.  UPS's reasons for

23  terminating Perez were legitimate, nondiscriminatory, and non-pretextual.  Based on the evidence,

24  on which there is no genuine dispute, I conclude that Perez cannot establish a prima facie case of

25  gender discrimination.

26  _____

27  [4] Perez asserts that Roberts lied in her report because Roberts wrote that she had reviewed the
grievances filed in Perez's center but during her deposition she admitted that she had not read the

28  document of grievances.  Opp. at 19; Dkt. No. 51-10 at 74–75.  But Roberts repeatedly claims that
she had discussed the grievances with Crouch, the labor manager.  Dkt. No. 51-10 at 74–75.

### B. Hostile Work Environment

The FEHA makes it illegal "[f]or an employer . . . because of . . . sex, gender, gender identity, gender expression . . . to harass an employee." CAL. GOV'T CODE § 12940(j)(1). "An employer may also be responsible for the acts of nonemployees, with respect to harassment of employees . . . in the workplace, if the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action." CAL. GOV'T CODE § 12940(j)(1). Perez's second cause of action is a hostile work environment claim against UPS, alleging that UPS knew or should have known of the harassment by the Union representatives, Gallegos, Huerta, and Padilla, and failed to take immediate and appropriate corrective action. Compl. ¶¶ 43–50.

The elements of a hostile work environment claim under FEHA are "(1) the plaintiff belongs to a protected group; (2) the plaintiff was subjected to unwelcome harassment because of being a member of that group; and (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Landucci v. State Farm Ins. Co.*, 65 F. Supp. 3d 694, 703 (N.D. Cal. 2014). Because this case concerns the alleged conduct of a nonemployee (Gallegos), an additional factor to consider is whether UPS took immediate and/or corrective action when it knew or should have known of the conduct. S*ee Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002) (explaining that, "In this circuit, employers are liable for harassing conduct by non-employees where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct.") (internal quotation marks omitted).

To satisfy the "severe or pervasive" requirement of a hostile work environment claim, the working environment created by the harassment "must be both objectively and subjectively offensive." *Hughes v. Pair*, 46 Cal. 4th 1035, 1044 (2009) (internal quotation marks omitted). "[A] plaintiff who subjectively perceives the workplace as hostile or abusive will not prevail if a reasonable person considering all the circumstances, would not share the same perception." *Id.* (internal quotation marks and alterations omitted). "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *Mokler v. Cty. of Orange*,

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

157 Cal. App. 4th 121, 142 (2007) (internal quotation marks and alterations omitted). Harassing acts that are "occasional, isolated, [or] sporadic" will not support a hostile work environment claim unless they are "extremely serious." *Id.* (internal quotation marks and alterations omitted). Rather, "the plaintiff must show a concerted pattern of harassment of a repeated, routine, or generalized nature." *Id.* On the other hand, a "workplace may give rise to liability when it is permeated with discriminatory intimidation, ridicule, and insult." *Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 279 (2006) (internal quotation marks and alterations omitted).

### 1.      Preemption

UPS contends that to the extent Perez's claims are based on protected activity under the NLRA—e.g., Gallegos, Padilla, and Huerta acting within their duties as Union representatives—it is preempted. Mot. at 25–26; Reply at 9–10. Courts in the Ninth Circuit have held that the NLRA preempts FEHA claims but there are exceptions to preemption, such as "issues of 'peripheral concern' to the NLRA." *Martinez v. United Parcel Serv., Inc.*, 2013 WL 3389550, at *6 (C.D. Cal. July 8, 2013) (citing *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 245 (1959)).

The cases UPS relies on involve claims that are "not peripheral to the purposes of the NLRA." *See id.* (finding that plaintiff's retaliation claim "was based on his assertion that he was terminated in part as a result of his union activities" which is "not peripheral" to the NLRA); *Guidry v. Marine Engineers & Beneficial Ass'n*, No. 11-CV-05347-CRB, 2012 WL 646302, at *3 (N.D. Cal. Feb. 28, 2012) (holding federal law preempted claims under the FEHA and of IIED because they "stem entirely from [the union's] conduct on his behalf" such as "the union's effort, or lack of effort, to secure work" for plaintiff); *Lee v. Am. Red Cross*, 2009 WL 10671966, at *3 (C.D. Cal. Mar. 26, 2009) (finding that plaintiff's claims that defendants prohibited employees from discussing terms and conditions of employment with coworkers fit "squarely within the ambit" of sections 7 and 8 of the NLRA"); *Kroeger v. Vertex Aerospace LLC*, 2020 WL 3546086, at *2 (C.D. Cal. June 30, 2020) (noting that it had found NLRA preemption where plaintiff's causes of action "principally relate to activity that is arguably protected" by the NLRA such as complaining "about alleged non-compliance with the CBA," and "engaging in union activities").

In this case, however, the claims are peripheral to the purposes of the NLRA:  Perez claims that UPS failed to take immediate and corrective action when it knew or should have known that its non-employees were harassing her because of her gender, which created an abusive and hostile environment.  Perez's FEHA claims are not preempted by the NLRA.  That said, it is relevant that the alleged harassment occurred while the Union representatives were conducting Union business on behalf of their members, which was protected activity.

### 2.    Harassment

UPS asserts that there is "absolutely no evidence that anyone harassed [Perez] based on her sex or gender" and instead the allegedly harassing conduct were normal work-related disputes between the Union and management.  Mot. at 22.  Perez repeatedly testified that the only people who she believes harassed her, discriminated against her, or created a hostile work environment for her, are three Union representatives, Gallegos, Padilla, and Huerta.  Perez Depo. at 107–08, 110, 186–87.  And she admitted that Huerta, Padilla, or Gallegos never made any comment that referenced her gender to her, let alone any sexually explicit, sexually inappropriate, or sexist comments to her.  *Id.* at 145–46.

### a.    Padilla and Huerta

Perez testified that she did not believe that Padilla and Huerta were harassing her because she is a woman and admitted that the conduct that she claimed was harassment was within the scope of their duties as Union stewards.  *Id.* at 179, 186–87.  When asked whether Padilla had ever acted inappropriately towards her, Perez mentioned one incident where Padilla inappropriately talked about a female customer with another colleague in front of her and another female colleague and that it was "obvious" that he wanted Perez to hear him and wanted to get a reaction out of her.  *Id.* at 115.  In her declaration, she claims that Padilla was standing directly outside her office and used extreme profanity when making this disparaging comment.  Perez Decl. ¶ 37. After Perez confronted him about this incident, Perez testified that Padilla stopped but joked that he had to watch what he had to say.  Perez Depo. at 116.

Perez did not testify that this incident was an example of Padilla's harassing conduct towards her.  *See id.* at 184.  Instead, she testified that other than "three conversations where

United States District Court
Northern District of California

[Padilla] slammed the papers on [her] desk, and he pointed his finger in [her] face, and he got upset with [her] about the 9.5 grievances, and the conversation where [she] told him he was harassing [her], and [he] denied it," there was nothing else that Perez considered to be harassment by Padilla. *Id.* Similarly, "[o]ther than asking [her] for documents and information on a regular basis" there was nothing else that Huerta did to Perez that she considered to be harassment. *Id.* at 185.

The incidents with Padilla and continual requests for documents by Huerta—that Perez does not subjectively believe were because of her gender and which were a part of their duties—do not constitute severe and pervasive harassment that would create an abusive work environment.

### b. Gallegos

Perez testified that she believed Gallegos, a Union employee, harassed her on the basis of her gender because he treated her peer male managers differently. Perez Depo. at 149–50. Specifically, she asserts that he treated the male peer managers more cordially than her and he did not file grievances against them, as he did to her. *Id.* She testified that the only instances of harassment by Gallegos were "the time [Gallegos] slammed his hand on [her] desk, the time he told [her] he would turn the center upside down, the time he confronted [her] at the PCM meeting in front of the work group, and [] filing false grievances against [her]." *Id.* at 131–32.

When a Union business agent like Gallegos files a grievance on the behalf of an employee, it can be a grievance against the company and not the center managers, but the Union business agent is obligated to notify the managers per the CBA. *See* Gallegos Depo. at 36. There are, however, some grievances alleging harassment by the center managers. Beginning in January 2019, Perez started receiving multiple grievances filed against her, which perplexed her because she had only been the subject of one grievance in her decades-long career up until then. *Id.* at 131; Perez Decl. ¶ 19. According to Perez, Gallegos unfairly filed three of these grievances against her and encouraged others to file false grievances against her, claiming that she harassed them. Perez Depo. at 136. Perez believed Gallegos's conduct was harassment because the grievances were false because she had the right to behave the way she did. *Id.* at 135–36. But she does not argue

United States District Court
Northern District of California

United States District Court
Northern District of California

1  that the employees who filed grievances against her were lying about her conduct.  *Id.*  And she

2  does not dispute that Union employees are entitled to file grievances when they believe there has

3  been a violation of the CBA.  Perez Depo. at 98.

4      Perez believes that Gallegos treated her the way he did because she was a female, an "easy

5  target for him," and he wanted to get her out.  *Id.* at 147.  When Perez asked the other male

6  managers whether they were receiving the same type of treatment from Gallegos—e.g., filing

7  grievances against them or getting in their face—they told her they were not.  *Id.* at 139, 149.

8  None of her peer male managers told her that they had problems with Gallegos or shared with her

9  that Gallegos was hard on someone.  *Id.* at 139.  The way Gallegos "[c]onducted business with

10  them," "how he dealt with grievances," and "everything" was "obviously" different from the way

11  he treated her.  *Id.* at 150.

12      According to Perez, she complied with all of Gallegos's demands, yet he still "nitpicked

13  every detail" and said she was incorrect; he did not treat the other managers this way.  *Id.* at 122.

14  Perez witnessed Gallegos shaking hands with the other male managers and joking around with

15  them, which was the "complete opposite" to how he treated her.  *Id.* at 140.  One supervisor, Ryan

16  Pedego, joked that because Gallegos was treating the other male managers differently, Gallegos

17  did not like her because she was female.  *Id.* at 128–29.  But Perez also admitted that Gallegos

18  may have been "picking on" her because she was a brand new manager and he could see that she

19  did not know all of the rules.  *Id.* at 147–48.

20      Perez told her peer male managers that she felt that Gallegos was treating her differently

21  because she was female, *Id.* at 130, and contends that there is a "triable issue of fact as to whether

22  Gallegos targeted female managers in particular" because "there is no evidence he became

23  physical with male managers or elicited grievances against them."  Opp. at 15.  In its reply, UPS

24  produced 102 copies of grievances, some of which were repetitive, filed by Gallegos against male

25  managers Venegas, Crouch, Valero, Connell, Chin, and Acafalle during the same time period as

26  Perez's harassment claims, between December 1, 2018 and July 31, 2019.  *See* Dkt. No. 52-5.

27      During the June 9, 2021, hearing, Perez's counsel pointed out that there were only two

28  harassment grievances that predated March 13 and one in May against a business manager.  *See*

Dkt. No. 52-5 at 17, 40, 65.  Perez's counsel argued that these grievances do not show that there was a successive period where Gallegos targeted one individual as he did Perez.  But Perez admitted in her deposition that Gallegos only filed three harassment grievances against her.  Perez Depo. at 135–36 ("Q:  What you're claiming is that they were false because the conduct that they were complaining of didn't constitute harassment; is that correct?  A:  That's correct . . . Q:  And how many of those kinds of grievances were filed against you?  A:  Three.).  When asked whether she had "any objection to any of the other grievances that were filed against [her] during the time period that [she] worked with Mr. Gallegos as a business agent,"  Perez responded, "No.  I mean, if he personally filed a grievance against me, I just, you know – I tried my best not to take it personally.  But I tried to comply with what he wanted because he has that right as a Union member."  Perez Depo. at 136.

Gallegos testified that he had filed grievances against Acafalle, Venegas, and Seymour, when she was a manager at the Morgan Hill Center.  Gallegos Depo. at 168.  When asked how many grievances he normally files, Gallegos responded that he had filed 1,500 grievances in a month between the San Jose and Sunnyvale facilities against both male and female managers and that he had 1,600 grievances on his agenda for that day alone.  *Id.* at 169–70.  As for Gallegos's temper, Venegas (a peer male manager) testified that although Gallegos never put a finger in his face or banged his hand on Venegas's desk, Gallegos would get into arguments with him, get angry, get close to him in his personal space, and ask for documentation related to the center.  Venegas Depo. at 25–28.

That Gallegos treated both male and female managers similarly while conducting Union business undermines Perez's argument that she was harassed on the basis of her gender.  Perez asserts that the fact that her "harassers may have been 'equal opportunity' (i.e., treating both men and women poorly) is irrelevant."  Opp. at 14.  But the single case on which Perez relies  is distinguishable.  In *EEOC v. National Education Association*, 422 F.3d 842, 845–46 (9th Cir. 2005), the Ninth Circuit refused to discount the differential treatment despite the few instances of hostile behavior toward male employees because there was "at least a debatable question as to the objective differences in treatment of male and female employees" and the record "strongly

1    suggests differences in subjective effects were very different for men and women."  As a result,

2    the Ninth Circuit found that a "reasonable woman" would find the behavior to be offensive and

3    hostile.  *Id.* at 846.

4        Here, a "reasonable woman" would not consider the incidents with Gallegos and the filing

5    of three grievances that was within the scope of his duty as a Union business agent to be so severe

6    or pervasive to have created a hostile environment.  *See e.g.*, *Mokler*, 157 Cal. App. at 144

7    (holding that three alleged incidents over a five-week period was insufficient for a hostile work

8    environment claim); *Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 295 (2006)

9    (recognizing that the FEHA "is not a 'civility code' and [is] not designed to rid the workplace of

10   vulgarity.").

11       In sum, the facts in the record, interpreted in the light most favorable to Perez, would not

12   lead a reasonable juror to conclude that Perez was subjected to harassment from Gallegos, Huerta

13   and Padilla that was so severe or pervasive to have created a hostile work environment, let alone

14   that the conduct occurred as a result of her gender.

15                         c.      **UPS's Corrective Actions**

16       Even if there is a disputed fact whether Gallegos's actions constituted harassment on the

17   basis of gender, Perez's claim still fails because UPS took immediate and corrective action in

18   response to the few times Perez told UPS management about it.  Perez asserts in her brief that she

19   "complained repeatedly from March through July to multiple managers" about Gallegos and that

20   she "made UPS aware of [the] harassment for months and UPS did nothing to stop it."  Opp. at

21   15–16.  But her deposition contradicts this.  Perez testified that the only times she complained

22   about the harassment by Gallegos, Huerta, or Padilla were (1) the conversation with Valero in

23   March 2019; (2) the emails sent to Crouch, Seymour, and Valero on March 13 and March 15; (3)

24   the text sent on June 19 to Sweeney; and (4) her Corporate Concern Complaint.  Perez Depo. at

25   196.  And the only times Perez mentioned that she felt harassed because of her gender were the

26   conversations with Valero, Sweeney, and her Corporate Concern Complaint.

27       In March 2019, Perez told Valero that she felt that Gallegos was harassing her because she

28   was a female.  Perez Depo. at 138, 153.  Valero responded that he wanted to find an employee to

United States District Court
Northern District of California

fire to "put the pressure for [Gallegos] to . . . veer away from [Perez]." *Id.* Perez did not believe this would help her and felt as though Valero did not do anything. *Id.* at 142–43. UPS contends that the only allegedly "harassing" behavior that Perez reported to Valero was that the Union representatives were approaching her without appointments, disputing employees' seniority dates, and filing grievances against her, which is not harassment and would not give Valero a reason to believe it was related to her gender. Reply at 8.

Whatever the merits of Valero's response, other UPS managers responded to Perez's concern. On March 13, 2019, Perez sent an email to UPS labor managers, Lori Seymour and Chad Crouch, copying Valero, about Gallegos, Padilla, Huerta, another Union steward Barreras, and an employee Robert Vela. *Id.* at 152–53. In the email, she said that she felt harassed because the Union representatives continued to file grievances against her and approach her about seniority list disputes. *Id.* She explained that the other two managers had told her Gallegos had not confronted them about the same issues or asked employees to file grievances against them. *Id.* She requested "support and help" for the harassment and help from HR about the seniority lists because Gallegos was "putting a lot of pressure" on her to resolve the matter. *Id.*

Thirty minutes later, Crouch responded and suggested a way to resolve the seniority list disputes and offered to sit down with Perez, Gallegos, and the other stewards. *Id.* at 95; Perez Depo. at 155–56. Crouch also said that he would "spend time with [Perez] on how to react and put together a case on someone and start to make people back off." Dkt. No. 50-1 at 95. Perez testified that she never sent any follow up to Crouch other than a "thank you" response to his email. Perez Depo. at 157. Perez did not mention that she felt harassed because she was female in the email. *See* Dkt. No. 50-1 at 95–96.

On March 25, 2019, Perez sent another email to Chad and Seymour, copying Valero, about Barreras, who had filed ten grievances, including two against Perez that alleged that Perez harassed him because she had told him that if he wore his Union pin again he would be fired for insubordination. *See* Dkt. No. 50-1 at 108; Perez Depo. at 159–60. In her email, Perez claims that she was the one who is feeling harassed, does not claim the harassment is because of her gender, and asks that Barreras be removed from her Center. *Id.* Perez does not dispute that Barreras had

the right to file the grievance.  Perez Depo. at 159.

On April 9, 2019, Crouch had the meeting with Perez, Seymour, and the Union team—Gallegos, Sweeney, Barreras, and one other person Perez could not remember.  Perez Depo. at 168.  During the meeting, according to Perez, Crouch told the Union team to stop filing false harassment grievances against her.  *Id.*  Although no one talked to Perez about how she felt harassed, she also did not say she felt harassed at the meeting because she was waiting for management to speak for her.  *Id.* at 169.  She did not mention that she felt that Gallegos was treating her differently because she was a woman.  *Id.* at 171.  Crouch told Gallegos and Perez that they needed to get to know each other and asked if both could move forward in a positive way; they both responded affirmatively.  *Id.* at 170.

After the meeting, Perez did not believe that things improved because Gallegos then encouraged others like Padilla and Huerta to harass her.  *Id.* at 177–78.  Although Padilla and Huerta initially had good relationships with Perez, things took a turn in April and May 2019.  *Id.*  But, as explained above, Perez did not believe Padilla and Huerta's "harassing" behavior was motivated by her gender; the isolated incidents that were part of Padilla and Huerta's duties as Union stewards do not constitute harassment.[5]

The third time she complained was on June 19, 2019, when Perez texted Sweeney, a Union employee who supervised Gallegos, and told him that she felt that Gallegos was harassing her; she threatened to escalate her complaints.  *Id.* at 188–89.  She explained that Gallegos had been harassing her for the last month about the 9.5 hours list and accused her of harassing employees when she was not doing so.  Perez Decl. ¶ 40.  She complained that Gallegos created a hostile work environment but did not complain that he harassed her because she was female.  *Id.*  Sweeney told Perez that if Gallegos did not "spit on her" or "push her" or "touch her" then she did not have a case.  Perez Depo. at 188–89.

---

[5] Perez also contacted Seymour about Padilla's behavior.  Perez Depo. at 198.  During the meeting, only Padilla shared his issues and there was no discussion of the harassment.  *Id.*  Perez testified that she never told Seymour that Gallegos harassed her because she was a woman or that Padilla harassed her.  *Id.*

United States District Court
Northern District of California

UPS is not responsible for any alleged failure to act on Sweeney's part. Sweeney is employed by the Union, not UPS. There is no evidence that Sweeney forwarded Perez's complaint to UPS.

The last time Perez complained to UPS management was on July 9, 2019, when she called UPS's 1-800 Corporate Concern hotline and filed the Corporate Concern Complaint of harassment.[6] She talked to UPS's hotline staff and also provided the hotline with a written account to provide more detail on her allegations of harassment. Perez Depo. at 266–69. She did her best to provide a complete account of the harassment in her written account. *Id.* at 270.

The investigation began on July 26, 2019. Dkt. No. 50-2 ("Roberts Depo.") at 45; *see* Dkt. No. 50-1 at 106–15 ("Roberts Corporate Concern Report"). From that date to August 29, 2019, HR Manager Heather Hubbard Roberts coordinated the investigation into Perez's complaint with the assistance of HR supervisor Kale Atencio. Roberts Depo. at 45; Dkt. No. 50-2 ("Austin Decl.") ¶ 52; Dkt. No. 50-11 at 348–52. Roberts, Atencio, and Nichols (who helped conduct the time card investigation) interviewed Crouch, Valero, Huerta, Padilla, Mark Quist (a driver), Gallegos, Christensen, and Venegas. Dkt. No. 50-11 at 348. After the investigation, Roberts and Atencio concluded that Perez's harassment claims on the basis of gender were unsubstantiated. *Id.*

Notwithstanding those facts, Perez claims that "No investigation of Perez'[s] July 2019 complaint was ever done" and she cites the testimonies of people who were not substantively involved in the investigation, such as Garrett, Chin, and Woods.[7] Opp. at 18. Perez also asserts that Crouch, Gallegos, and Padilla all deny being interviewed by anyone in connection with Roberts' report. Opp. at 19. But this mischaracterizes their testimony and does not support

---

[6] In her opposition, Perez also argues that she discussed the harassment during the July 3, 2019 meeting with Woods and Austin. Opp. at 28; Dkt. No. 51-14 ("Woods Depo.") at 41. But Woods responded appropriately—he told Perez to submit her complaint to HR or the hotline—and Perez followed his advice. Woods Depo. at 41.

[7] Perez also points to Chin's testimony that when he reported two instances where Union representatives had become abusive and hostile to him in the workplace, the Union representative was removed. Opp. at 18; Chin Depo. at 46–48. In comparison, no one removed Gallegos when she asked. Opp. at 18. But UPS asserts that Perez never asked anyone to remove Gallegos. Reply at 8 n.8. UPS also points out that it does not have the authority to terminate a Union business agent and that in Chin's situation, it was the Union, not UPS, who had removed the business agent. Reply at 8 n.8; Chin Depo. 47, 50.

1    Perez's contention that an investigation never occurred.  Padilla denied being interviewed by

2    Austin, Woods, and Crouch because it was Nichols and Atencio who interviewed him.  *See* Dkt.

3    No. 51-13 at 58–59; Roberts Depo. at 51–52.  Gallegos did not remember being asked questions

4    about gender discrimination and could only vaguely remember having an interview with someone

5    but did not remember the details.  Gallegos Depo. at 158.  And Crouch testified that he had had

6    multiple strokes since the interview that had impacted his memory of the events.  Dkt. No. 52-3

7    ("Crouch Depo.") at 24.  Their testimony does not call into question whether an investigation

8    occurred.

9        In short, UPS took timely, appropriate action in light of the labor/management context of

10    the complaints made by Perez the few times that she raised them.  There is no genuine dispute of

11    material fact.  Based on the evidence, Perez's hostile work environment claim fails.

### III.    WHETHER UPS HAD A LEGITIMATE, NON-DISCRIMINATORY, AND NON-RETALIATORY REASON FOR TERMINATING PEREZ'S EMPLOYMENT

    Under the third, fourth, and fifth causes of action, Perez claims that UPS (1) retaliated

against her by terminating her employment for a protected activity in violation of CAL. GOV'T

CODE § 12940(h); (2) failed to prevent discrimination, harassment, and retaliation in violation of

CAL. GOV'T CODE § 12940(k); and (3) terminated her in violation of a fundamental public policy

of California.  Compl. ¶¶ 51–62; 63–70; 71–75.  These causes of action are essentially derivative

of the ones discussed earlier.  For the same reasons, these three causes of action fail.

#### A.    Retaliation

    Perez's third cause of action claims that UPS violated CAL. GOV'T CODE § 12940(h) by

terminating her for complaining about being harassed because of her gender in the workplace.

Compl. ¶¶ 51–62.  To establish a prima facie case of retaliation, Perez must show (1) involvement

in a protected activity, (2) an adverse employment action, and (3) a causal link between the two.

*See Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).  "Thereafter, the burden of

production shifts to the employer to present legitimate reasons for the adverse employment action.

Once the employer carries this burden, the plaintiff must demonstrate a genuine issue of material

fact as to whether the reason advanced by the employer was a pretext.  Only then does the case

United States District Court
Northern District of California

1    proceed beyond the summary judgment stage." *Id.* FEHA defines protected activity as opposing

2    practices forbidden under the statute such as discrimination, harassment, or retaliation on the basis

3    of enumerated categories (i.e., race, religion, sex), or assisting in proceedings raising such claims.

4    CAL. GOV'T CODE § 12940(h).

5         Perez asserts that she was terminated in retaliation for her final Corporate Concern

6    Complaint after she had engaged in multiple forms of protected activity.[8] Opp. at 26. She

7    emphasizes that she mentioned the harassment to Woods and Austin during the July 3, 2019

8    meeting, made the Corporate Concern Complaint on July 9, 2019, was put on administrative leave

9    on July 11, 2019, and was terminated without an investigation of her claims in August 2019. *Id.* at

10   26, 28. According to Perez, she was never offered the option of progressive discipline instead of

11   termination and she claims that no one interviewed her in connection with the retaliation and

12   timecard fraud investigations. *Id.* To Perez, UPS "made up its mind on July 9, 2019 when it

13   received her final complaint." *Id.*

14        Although Perez's actions are "protected activity," there is no "causal link" between

15   Perez's protected activity and her termination. Consider the facts that I discussed earlier. First,

16   her complaints in March and April are too far removed from her August termination to establish

17   temporal proximity between her protected activity and adverse employment action. *See Clark*

18   *County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (finding that temporal proximity must

19   be "very close" to make a prima facie case of retaliation and that three months was not sufficient).

20   Next, Perez did not tell Seymour she was being harassed because of her gender and Sweeney is a

21   Union manager who had no authority to terminate her. Importantly, the timecard fraud

22   investigation began a month before Perez complained to Austin and Woods on July 3. In fact,

23   Woods had recommended that Perez be terminated on July 8, 2019, one day before Perez called

24   the hotline. Dkt. No. 50-9 at 16–17. Moreover, Austin testified that the decision to put Perez on

26   ────────────

27   [8] Examples of protected activities include how "she asked for HR assistance on 3/13/19; she asked
     to move a harasser from her center on 3/25/19; participated in the 4/9/19 meeting; she told
     Seymour in 5/19 and Sweeney on 6/19/19 that she was filing formal charges; she filed a further
28   complaint on 7/9/19; and ultimately she objected to the false claims that she had retaliated against
     fellow employees." Opp. at 26.

1    administrative leave occurred on July 9, 2019, before Perez filed her Corporate Concern

2    Complaint and before Austin was aware of it.  And the retaliation investigation, which was the

3    reason for the administrative leave, began on July 5, 2019, four days before Perez called the

4    hotline.  Dkt No. 50-6 at 12–17; Dkt. No. 50-10 at 11–12.

5         In sum, if Perez was able to establish a prima facie case of retaliation, she could not show

6    that UPS's reason for termination—timecard fraud and retaliation—was pretextual.  Her third

7    cause of action also fails.

8              **B.        Failure to Prevent Discrimination, Harassment, and Retaliation**

9         Perez's fourth cause of action claims that UPS did not take reasonable steps to prevent any

10   discrimination, harassment, and retaliation as required by CAL. GOV'T CODE § 12940(k).  Compl.

11   ¶¶ 63–70.  "When a plaintiff seeks to recover damages based on a claim of failure to prevent

12   discrimination or harassment, she must show three essential elements: (1) [she] was subjected to

13   discrimination, harassment or retaliation; (2) defendant failed to take all reasonable steps to

14   prevent discrimination, harassment, or retaliation; and (3) this failure caused [her] to suffer

15   injury."  *Leland v. City & Cty. of San Francisco*, 576 F. Supp. 2d 1079, 1103 (N.D. Cal. 2008).

16   Reasonable steps that employers may be required to take to prevent discrimination from occurring

17   include "prompt investigation" of discrimination claims, "the establishment and promulgation of

18   antidiscrimination policies," and "the implementation of effective procedures to handle complaints

19   and grievances regarding discrimination."  *California Fair Employment & Hous. Comm'n v.*

20   *Gemini Aluminum Corp.*, 122 Cal. App. 4th 1004, 1024–25 (2004).

21        Perez concedes that her fourth claim is "derivative of her earlier claims."  Opp. at 28.  As I

22   found above, Perez was not subjected to discrimination, harassment, or retaliation.  If she was,

23   UPS took reasonable steps under the circumstances to prevent the discrimination, harassment, or

24   retaliation.  Perez's fourth cause of action also fails.

25              **C.        Violation of Public Policy**

26        An employer's discharge of an employee in violation of a fundamental public policy

27   embodied in a constitutional or statutory provision can give rise to a tort action.  *Barton v. New*

28   *United Motor Manufacturing, Inc.*, 43 Cal.App. 4th 1200, 1205 (1996).  Under California law,

United States District Court
Northern District of California

38

terminating an employee because of her disability or in retaliation for complaining of discriminatory conduct is sufficient to support a claim for wrongful termination in violation of public policy. *City of Moorpark v. Superior Court*, 18 Cal.4th 1143, 1158–61 (1998). Perez's fifth cause of action alleges wrongful discharge because her termination was in violation of a fundamental public policy—prohibition of an employer from discriminating against an employee on the basis of gender. Compl. ¶¶ 71–75. She reiterates that UPS terminated her because of Perez's complaints about the harassment, which were protected activities. *Id.*

Perez admits that her fifth claim is "derivative of her earlier claims." Opp. at 28. Because I find that Perez was not wrongfully discharged, Perez's fifth cause of action fails.

## IV.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Under the sixth cause of action Perez seeks to recover damages to compensate for the emotional distress intentionally caused by UPS's wrongful conduct. Compl. ¶¶ 76–80. To establish intentional infliction of emotional distress, Perez must show outrageous conduct by UPS. *Heller v. Pillsbury Madison & Sutro*, 50 Cal.App.4th 1367, 1388 (1996). To be outrageous, the conduct must be so extreme as to "exceed all bounds of that usually tolerated in a civilized society." *King v. AC & R Adver.*, 65 F.3d 764, 770 (9th Cir. 1995) (citation omitted). "Summary judgment is proper if a claim cannot reasonably be regarded as so extreme and outrageous as to permit recovery." *Id.* (internal quotation marks and citations omitted).

For the reasons above, I find that UPS did not act wrongfully when terminating Perez. Its conduct certainly did not give rise to an intentional infliction of emotional distress claim. *See Janken v. GM Hughes Electronics*, 46 Cal.App. 4th 55, 80, 53 (1996) ("A simple pleading of personnel management activity is insufficient to support a claim of intentional infliction of emotional distress, even if improper motivation is alleged. If personnel management decisions are improperly motivated, the remedy is a suit against the employer for discrimination."); *Walker v. Boeing Corp.*, 218 F.Supp.2d 1177, 1190 (C.D. Cal. 2002) ("Terminating an employee for improper or discriminatory reasons, like many adverse personnel management decisions, is insufficiently extreme or outrageous to give rise to a claim for intentional infliction of emotional distress."). Perez's final cause of action also fails.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**CONCLUSION**

For the reasons described above, UPS's motion for summary judgment is GRANTED with respect to all six of Perez's causes of action.  Judgment will be entered accordingly.

**IT IS SO ORDERED.**

Dated:  August 18, 2021



William H. Orrick
United States District Judge